IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A BLUE MOTOROLA CELLULAR DEVICE WITH A BLACK CASE CURRENTLY LOCATED AT THE ATF PENSACOLA FIELD OFFICE | Case No.: 3:25mj196/ZCB |
| IN THE MATTER OF THE SEARCH OF A GREY TCL CELLULAR DEVICE WITH A RED CASE CURRENTLY LOCATED AT THE ATF PENSACOLA FIELD OFFICE | Case No.: 3:25mj197/ZCB |
| IN THE MATTER OF SEARCH OF A GREY FOXX CELLULAR DEVICE WITH A CLEAR CASE CURRENTLY LOCATED AT THE ATF PENSACOLA FIELD OFFICE | Case No.: 3:25mj198/ZCB |

**AFFIDAVIT IN SUPPORT OF AN
APPLICATION UNDER RULE 41 FOR
WARRANTS TO SEARCH AND SEIZE**

Your Affiant, Bryan A. Barton, being first duly sworn, hereby deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. Your Affiant makes this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing

RCVD USDC FLND PN
JUL 8 '25 AM 11:57

the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachments B-1, B-2, and B-3.

2. Your Affiant is a Task Force Officer (hereinafter "TFO") with the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF"), assigned to the Pensacola Field Office, and has served in that capacity since March 2025. Your Affiant is also a Special Agent (hereinafter "SA") with the Florida Department of Law Enforcement (hereinafter referred to as "FDLE") and has been so employed since May 2024. Prior to this employment, your Affiant was employed as a deputy and an investigator with the Escambia County Sheriff's Office between May 2012 and May 2024. The information set forth in this affidavit is based on an ongoing investigation of a cocaine distribution organization that has resulted in the seizure of cocaine and methamphetamine. Additionally, the information set forth in this affidavit is based upon information relayed to me by other federal and state law enforcement officers, corroborated sources of information, and my own observations during this investigation.

3. Your Affiant has participated in investigations of individuals who have violated state and Federal laws, particularly those laws found in Titles 18 and 21 of the United States Code. Your Affiant has conducted and participated in ATF controlled operations where confidential informants and undercover agents were

2

utilized to purchase firearms and narcotics. Your Affiant has conducted and participated in surveillance operations that yielded information pertaining to firearms and narcotics laws violators. Your Affiant has written search warrant affidavits and obtained search warrants for, among other things, residences, electronic devices, social media user accounts, and information pertaining to the location of cellular telephones. Your Affiant has participated in the execution of search warrants wherein firearms, ammunition, large amounts of narcotics, currency, tools, paraphernalia, and records of firearms and narcotics trafficking have been recovered. Your Affiant has conducted and participated in the arrests of firearms and narcotics law violators. Your Affiant has had conversations with other experienced agents regarding illicit firearms possession and narcotics trafficking activities, and the many different enforcement methods used to combat firearms and narcotics law violators.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

4. Your Affiant presents this affidavit in support of applications for search warrants to search and to seize relevant evidence found within the following cellular devices: One (1) blue Motorola Cellular Device in a black case bearing an unknown IMEI (ATF Item number 7) (as more fully described in Attachment A-1 and hereinafter referred to as "TARGET DEVICE 1"); One (1) grey TCL Cellular Device in a red case bearing an unknown IMEI (ATF Item number 8) (as more

fully described in Attachment A-2 and hereinafter referred to as "TARGET DEVICE 2"); and One (1) grey Foxx Cellular Device in a clear case bearing an unknown IMEI (ATF Item number 29) (as more fully described in Attachment A-3 and hereinafter referred to as "TARGET DEVICE 3").

5. The applied-for warrants would authorize the forensic examination of the devices for the purpose of identifying electronically stored data for evidence of possession of a firearm by a convicted felon, in violation of Title 18, United States Code, Section 922(g), use of firearm in federal drug/violent crime in violation of Title 18 United States Code 924(c), and possession with the intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841, as more particularly described in Attachments B-1, B-2, and B-3.

6. Your Affiant has not included each and every fact your Affiant knows of this investigation. Rather, your Affiant has included only those facts your Affiant believes are needed to demonstrate probable cause for the warrants sought. The information in this affidavit is based on your Affiant's personal knowledge and observations, on information conveyed to your Affiant by other law enforcement officials or cooperating witnesses, and based upon my review of records, recordings, documents and other physical evidence related to the activities described herein.

4

7. As further discussed below, the investigation has thus far established that Carlton SHOEMAKER utilizes TARGET DEVICE 1, TARGET DEVICE 2, and TARGET DEVICE 3.

## PROBABLE CAUSE

8. Federal and state law enforcement have been conducting a criminal investigation of SHOEMAKER for the unlawful distribution of cocaine, as well as other controlled substances, and firearms violations. within the Northern District of Florida. The investigation revealed that SHOEMAKER resided in room 14 of the Venus Relax Inn located at 3725 Mobile Highway, Pensacola, Florida. Law enforcement observed SHOEMAKER at room 14 on a daily basis and observed short-term traffic to and from this location on multiple occasions between the months of April and June 2025, when SHOEMAKER was present.

9. On or about May 2, 2025, ATF agents conducted a controlled buy operation, during which a confidential informant (CI) purchased a quantity of suspected crack cocaine and a quantity of suspected methamphetamine from SHOEMAKER inside room 14 at the Venus Relax Inn. Prior to and after the operation, the CI was searched for contraband with none being found. The CI was equipped with an electronic recording device to record audio and video of the event, as well as an audio transmitting device so law enforcement could monitor the operation in real-time. The CI was provided a sum of FDLE buy money to

5

purchase narcotics. While under constant law enforcement surveillance, the CI traveled to room 14 at the Venus Relax Inn. The CI entered the front door, met SHOEMAKER inside, and inquired about purchasing crack cocaine and methamphetamine from SHOEMAKER. During the transaction, the CI observed a black semi-auto handgun laying on the table where SHOEMAKER stored the narcotics. While inside room 14, the CI provided a portion of the FDLE buy money to SHOEMAKER and SHOEMAKER provided the CI a quantity of suspected crack cocaine and a quantity of suspected methamphetamine. The CI then departed room 14, traveled back to meet with law enforcement, and provided the suspected crack cocaine and suspected methamphetamine to an ATF agent. The suspected crack cocaine was tested with a field test kit, which yielded a presumptive positive result for the presence of cocaine. The suspected methamphetamine was tested with a field test kit, which yielded a presumptive positive result for the presence of methamphetamine. The suspected crack cocaine and the suspected methamphetamine were sent the Drug Enforcement Administration (hereinafter referred to as "DEA") laboratory for testing.

10. On or about May 23, 2025, ATF agents conducted a controlled buy operation, during which the CI purchased a quantity of suspected crack cocaine and a quantity of suspected methamphetamine from SHOEMAKER inside room 14 at the Venus Relax Inn. Prior to and after the operation, the CI was searched for

purchase narcotics. While under constant law enforcement surveillance, the CI traveled to room 14 at the Venus Relax Inn. The CI entered the front door, met SHOEMAKER inside, and inquired about purchasing crack cocaine and methamphetamine from SHOEMAKER. During the transaction, the CI observed a black semi-auto handgun laying on the table where SHOEMAKER stored the narcotics. While inside room 14, the CI provided a portion of the FDLE buy money to SHOEMAKER and SHOEMAKER provided the CI a quantity of suspected crack cocaine and a quantity of suspected methamphetamine. The CI then departed room 14, traveled back to meet with law enforcement, and provided the suspected crack cocaine and suspected methamphetamine to an ATF agent. The suspected crack cocaine was tested with a field test kit, which yielded a presumptive positive result for the presence of cocaine. The suspected methamphetamine was tested with a field test kit, which yielded a presumptive positive result for the presence of methamphetamine. The suspected crack cocaine and the suspected methamphetamine were sent the Drug Enforcement Administration (hereinafter referred to as "DEA") laboratory for testing.

10. On or about May 23, 2025, ATF agents conducted a controlled buy operation, during which the CI purchased a quantity of suspected crack cocaine and a quantity of suspected methamphetamine from SHOEMAKER inside room 14 at the Venus Relax Inn. Prior to and after the operation, the CI was searched for

contraband with none being found. The CI was equipped with an electronic recording device to record audio and video of the event, as well as an audio transmitting device so law enforcement could monitor the operation in real-time. The CI was provided a sum of FDLE buy money to purchase narcotics. While under constant law enforcement surveillance, the CI traveled to room 14. The CI entered the front door, met SHOEMAKER inside, and inquired about purchasing crack cocaine and methamphetamine from SHOEMAKER. While inside room 14, the CI provided a portion of the FDLE buy money to SHOEMAKER and SHOEMAKER provided the CI a quantity of suspected crack cocaine and a quantity of suspected methamphetamine. The CI asked SHOEMAKER about the firearm that was in plain view during the last transaction. SHOEMAKER retrieved what appeared to the CI to be the same firearm from inside a drawer and began manipulating the firearm's action. The CI believed the firearm was loaded with what appeared to be live ammunition. SHOEMAKER also informed the CI that a rifle was concealed inside the room in an unknown location. The CI then departed room 14, traveled back to meet with law enforcement, and provided the suspected crack cocaine and suspected methamphetamine to an ATF agent. The suspected crack cocaine was tested with a field test kit, which yielded a presumptive positive result for the presence of cocaine. The suspected methamphetamine was tested with a field test kit, which yielded a presumptive positive result for the presence of

methamphetamine. The suspected crack cocaine and the suspected methamphetamine were sent the Drug Enforcement Administration laboratory for testing.

11. Your Affiant has personally reviewed the audio and video recordings of the above-described transactions and found them to be of good quality. The audio and video recordings for each of the two controlled buy operations clearly depict the CI receive a quantity of suspected crack cocaine and a quantity of suspected methamphetamine from an individual matching the description of SHOEMAKER inside room 14 at the Venus Relax Inn, located at 3725 Mobile Highway, Pensacola, Florida. During both of the above-described transactions, SHOEMAKER was armed with a handgun. During the most recent transaction, SHOEMAKER informed the CI that an additional rifle was concealed somewhere inside the room. Due to SHOEMAKER's status as a convicted felon, he is prohibited from possessing any firearms.

12. On June 9, 2025, your Affiant conducted surveillance on SHOEMAKER at room 14 of the Venus Relax Inn. Your Affiant observed SHOEMAKER arrive at room 14. Within approximately a 30-minute timeframe, your Affiant observed two (2) vehicles as well as two (2) pedestrians quickly arrive and leave room 14 of the Venus Relax Inn. All of these visitors departed the

location within minutes of their arrival. Your Affiant knows through training and experience that this short-term traffic is consistent with narcotics distribution.

13. Your Affiant submitted a federal search warrant for room 14 of the Venus Relax Inn. That warrant was signed by the Honorable Hope Thai Cannon on June 10, 2025. (Case number 3:25mj180-HTC). The warrant was executed by law enforcement on June 16, 2025.

14. During the execution of the search warrant at room 14, law enforcement noted that SHOEMAKER was the sole occupant of the room. The search revealed a stolen Hi-Point 9mm handgun, a .22 caliber handgun, 9mm and .22 caliber ammunition, approximately three ounces of marijuana, approximately 14 grams of cocaine, approximately $2,500 of United States Currency, and paraphernalia consistent with the distribution of narcotics. Law enforcement also located TARGET DEVICES 1-3 inside the room with SHOEMAKER.

15. TARGET DEVICE 1, TARGET DEVICE 2 and TARGET DEVICE 3, are currently in the lawful possession of the ATF Pensacola Field Office. In my training and experience, your Affiant knows that TARGET DEVICE 1, TARGET DEVICE 2, and TARGET DEVICE 3 are stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as when the devices first came into the possession of the ATF. These devices were

seized pursuant to a lawful premises search warrant; however, these device search warrants are sought out of an abundance of caution.

16. During the course of my training and experience and through conversations with other more experienced law enforcement officers, your Affiant has learned of various methods used by narcotics traffickers to conceal their assets, income, and activities from the government and other third parties. Based on my training and experience, and through conversations with other officers and agents, your affiant knows the following:

   a. Narcotics traffickers often utilize cellular telephones to facilitate communication with co-conspirators and/or store telephone numbers/addresses of associates;

   b. Narcotics traffickers often utilize multiple cellular telephones to compartmentalize their narcotics trafficking business. Multiple cellular telephones are often utilized in an effort to maintain anonymity and independent contact between sources of supply and a range of customers;

   c. Narcotics traffickers maintain records, receipts, notes, ledgers, and other items relating to the transportation, ordering, sale and distribution of controlled substances, which are usually maintained where the traffickers have ready access to them and are often stored

on digital media;

d. Narcotics traffickers commonly maintain addresses or telephone numbers in devices which list names, addresses and/or telephone numbers of their associates in the trafficking organization; such records are normally maintained within places/things under their control;

e. Narcotics traffickers take or cause to be taken photographs of themselves, their associates, their property, and the illegal narcotics they distribute or firearms or U.S. currency they possess, and often maintain these photographs within places/things under their control, including on cellular devices;

f. Narcotics traffickers commonly use cellular telephones in order to communicate with their criminal associates and those telephones are commonly carried with them or kept at locations under their custody and control, such as their residences and vehicles, and contain names, numbers and other information stored in the phones; and

g. Narcotics traffickers commonly are involved in money laundering and retain records of their transactions within places/things under their control. Records of this kind are also often stored on digital media.

## **TECHNICAL TERMS**

17. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These

signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

18. Based on my training, experience, and research, I know that the devices have capabilities that allow them to serve as a wireless telephone, digital camera, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

19. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

20. *Forensic evidence.* As further described in Attachments B-1, B-2, and B-3, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the devices were used, the

purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the devices because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the

application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

21. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

22. *Manner of execution.* Because these warrants seek only permission to examine devices already in law enforcement's possession, the execution of the warrants does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

23. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the devices described in Attachment A-1, A-2, and A-3, to seek the items described in Attachment B-1, B-2, and B-3.

Respectfully submitted,

Bryan A. Barton
Task Force Officer
Bureau of Alcohol Tobacco Firearms
and Explosives

Subscribed and sworn to before me on this __8__ day of July 2025.

Zachary C. Bolitho
United States Magistrate Judge